**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EAGLE COUNTY, COLORADO<br>500 Broadway<br>P.O. Box 850<br>Eagle, Colorado 81631<br><br>      Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>THE INTERIOR,<br>1849 C Street, NW<br>Washington, D.C. 20240<br><br>BUREAU OF LAND MANAGEMENT<br>1849 C Street, NW,<br>Washington, D.C. 20240,<br><br>      Defendants. | Case No. _____ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Eagle County, Colorado brings this action challenging unlawful actions by

Defendants Department of the Interior (Interior) and Bureau of Land Management (BLM)

including: (1) Interior's arbitrary and unlawful issuance of emergency environmental review

procedures under the pretext of an "energy emergency" that violates Interior's regulations and

federal law, and (2) BLM's rushed authorization under the unlawful emergency environmental

review procedures of an amended right-of-way (the Wildcat Facility Expansion or Project) that

would significantly increase the transloading of oil trains at Wildcat Loadout Facility (Wildcat

Facility) in Carbon County, Utah.  Interior's issuance of the emergency environmental review

procedures and BLM's decision to authorize the Wildcat Facility Expansion violate the Federal

1

Land Policy and Management Act (FLPMA), the National Environmental Policy Act (NEPA), and the Administrative Procedure Act (APA).

**INTRODUCTION**

1.     In 2023, when BLM published on its website that it was processing a right-of-way amendment to significantly expand the Wildcat Facility, Eagle County, environmental groups, political leaders, and communities downline from the Facility raised significant concerns with BLM.   By authorizing the right-of-way amendment, and the expansion of the Wildcat Facility, BLM would have authorized a 400% increase in the amount of oil transloaded from trucks to trains each day at the Facility, causing a significant increase in oil trains on a rail line owned by the Union Pacific Railroad (the Union Pacific Line) that traverses the Rocky Mountains, mere feet from the Colorado River, and across Eagle County and Colorado.

2.     Eagle County and others submitted extensive comments to BLM alerting the agency to the environmental risks associated with increasing the number of oil trains traveling through Colorado.  The County urged BLM to consider the increased risk of accidents, derailments, wildfires, and oil spills that could devastate public lands, critical water sources including the Colorado River, and nearby communities who would endure the increased daily traffic of oil trains originating from the Wildcat Facility.

3.     In response, BLM committed to adequately considering these environmental effects under FLPMA and NEPA, including undergoing public notice and comment on BLM's environmental review of the Wildcat Facility Expansion.  As 2024 approached, the Project application languished with the proponent failing to provide information to BLM, eventually resulting in BLM terminating the environmental review process. With this indefinite delay, the increased environmental risks threatened by the Project were temporarily abated.

4.      This hiatus ended in May 2025, when the Wildcat Facility Expansion application resurfaced and BLM abruptly reneged on its previous commitment to conduct a thorough and transparent environmental review of the proposed Wildcat Facility Expansion, with the public's participation.  BLM notified the public that at the request of Coal Energy Group 2, LLC (Coal Energy), the application proponent and operator of the Facility, BLM would process the application for the proposed Wildcat Facility Expansion pursuant to Interior's recently issued "alternative arrangements for NEPA compliance" (referred to as the Alternative Arrangements), which were developed in response to a "National Energy Emergency" as declared by President Trump's Executive Order 14,156 on January 20, 2025 (Executive Order).

5.      Under the Alternative Arrangements, BLM circumvented the standard NEPA environmental review procedures and authorized the Wildcat Facility Expansion in a matter of weeks without public review and comment.  BLM's decision under this procedure was fundamentally flawed for several reasons, with the most obvious being that the decision applied Interior's unlawful Alternative Arrangements, which were issued based on an invalid application of Interior's emergency authority.  Interior's emergency response regulations only allow the agency to bypass standard NEPA procedures and expedite review of projects when Interior

"determines that an emergency exists that makes it necessary to take urgently needed actions before preparing a NEPA analysis and documentation."  43 C.F.R. § 46.150 (2024).[1]

6.      Interior failed to make a determination that the purported emergency upon which the Alternative Arrangements are based in fact exists or is an emergency of the kind contemplated in Interior's regulations, which authorize, under only limited circumstances, Interior or its subagencies to circumvent NEPA's standard procedures.  Further, in issuing the Alternative Arrangements, Interior failed to subject the arrangements to any rulemaking procedure.

7.      The widely available and publicly known facts show that there is no national energy emergency.  Indeed, instead of applying the Alternative Arrangements in a mandatory fashion to every proposed energy project in the way that a true emergency would demand, the Alternative Arrangements are instead selectively applied by Interior to a proposed project only upon the request of the project proponent, such as Coal Energy.

8.      If an "energy emergency" did exist, using the Alternative Arrangements to approve an oil loadout facility in a discretionary fashion is not authorized by Interior's emergency response regulations, which only allow such alternative procedures "*necessary* to control the immediate impacts of the emergency that are urgently needed to mitigate harm to life, property, or important natural, cultural, or historic resources."  *Id.* § 46.150(a) (emphasis added).

---

[1] Interior revised and partially rescinded its NEPA regulations by interim final rule in mid-2025, with the revisions effective July 3, 2025.  National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 29,498–29,507 (July 3, 2025) (to be codified at 43 C.F.R. pt. 46).  The final rule was issued on February 24, 2026.  *See* National Environmental Policy Act Implementing Regulations, 91 Fed. Reg. 8,738–8,762 (Feb. 24, 2026) (to be codified at 43 C.F.R. pt. 46).  The notices for the interim rule and the final rule provide that Interior's "[r]evised agency procedures will have no effect on ongoing NEPA reviews, where [Interior], following CEQ guidance, will continue to apply the preexisting procedures to applications that are sufficiently advanced."  *Id.* at 8,739; 90 Fed. Reg. at 29,500.  BLM's review of the proposed Wildcat Facility Expansion was sufficiently advanced by July 3, 2025, and, as such, Eagle County's citations to Interior's regulations are to the 2024 version that applies to the Wildcat Facility Expansion.

9.      BLM's use of the Alternative Arrangements to expedite review of projects where no "emergency exists" is unlawful, and BLM's decision to authorize the Wildcat Facility Expansion demonstrates the lack of any factual or legal basis for the Alternative Arrangements, which unlawfully exclude the public from an agency's environmental review of energy projects.

10.      BLM's processing of the Wildcat Facility Expansion under the Alternative Arrangements after BLM had cancelled its review of the Project a year earlier, is based on a conclusory assertion that an energy emergency exists warranting expedited processing of the Project.  But rushing a long-dormant expansion of an oil transloading facility does not fall within Interior's limited emergency response exceptions to following standard NEPA procedure.

11.      BLM's authorization of the Wildcat Facility Expansion under the Alternative Arrangements—after determining that the project needed extensive environmental review and public scrutiny—violates federal environmental laws.  BLM failed to determine the project is in the public interest and complies with FLPMA's mandates.  BLM improperly and unnecessarily prevented Eagle County and the public from providing input about the Project's reasonably foreseeable impacts to public lands, the environment, and communities downline from the Facility that will experience the effects resulting from the significant increase of oil trains caused by the Wildcat Facility Expansion.

12.      BLM's failure to conduct an adequate environmental review of the Wildcat Facility Expansion violates NEPA and FLPMA and results in an arbitrary and unlawful decision.[2]

---

[2] This Complaint also includes the County's claims challenging BLM's violations of the Freedom of Information Act (FOIA), 5 U.S.C. § 552, including BLM's failure to make a timely determination under FOIA.

**JURISDICTION AND VENUE**

13. This Court has jurisdiction over Eagle County's claims challenging Interior's emergency procedures and BLM's decision to authorize the Wildcat Facility Expansion pursuant to 28 U.S.C. § 1331 (federal question).  This Court also can provide relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), and the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 702, and 706.

14. Venue in the District of Columbia for the County's claims against Interior and BLM is appropriate under 28 U.S.C. § 1391(b)(1) and (2) because Defendants Interior and BLM are federal agencies of the United States with their primary offices located in Washington, D.C.

15. The Alternative Arrangements were issued by Interior in Washington, D.C.  The authorization to review the Wildcat Facility Expansion under the Alternative Arrangements and the subsequent approval of the Project that is now challenged in this action was granted by Adam G. Suess, Assistant Secretary of Land and Minerals Management in Washington, D.C., among other officials in Washington, D.C., and therefore, a substantial part of the events and omissions at issue took place in this District.

16. This Court has jurisdiction over the County's claims under FOIA, which vests jurisdiction in the U.S. District Court for the District of Columbia.  5 U.S.C. § 552(a)(4)(B).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under FOIA, a federal statute.  Injunctive relief is appropriate under FOIA.  5 U.S.C. § 552(a)(4)(B).  Declaratory relief is appropriate under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

17. Venue in the District of Columbia for the County's claims is appropriate under FOIA pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

**PARTIES**

18. **Plaintiff Eagle County, Colorado**.  Eagle County is a county empowered under the laws of the State of Colorado to make and enforce regulations to manage and regulate, among many things, infrastructure, to protect the health, safety, and welfare of its citizens, and to

preserve and enhance the environment, natural and historic resources, livability, and aesthetic quality of Eagle County.

19.     To that end, Eagle County has established laws and policies intended to improve and protect the health, safety, welfare, and quality of life for its residents, and to preserve and protect the County's environment and natural and historic resources and properties.

20.     Eagle County is located in the Rocky Mountains in central Colorado and is comprised of almost 1,700 square miles of pristine mountainous terrain, valleys, rivers, and forests.  The County has nine towns and some of the most popular ski resorts in the country.  A vast majority of Eagle County's land is public and includes natural areas and other lands owned by the County or the State of Colorado, federal national forests and wilderness areas, and lands managed by BLM.

21.     The County's environment provides unique and critical wildlife habitat and world-class recreational opportunities including hiking, mountain biking, skiing, fishing, rafting, and hunting.  The health of Eagle County's environment and natural resources is critical to the County's communities and to its economy, which relies on tourism to support the County's economy and local businesses.  Thus, Eagle County makes the protection and enhancement of the County's natural environment a priority to ensure the health, safety, welfare, and economic well-being of its citizens.

22.     Eagle County has established many regulations and policies to protect its environment and resources and public safety.  For example, in 2002, the Board of County Commissioners established the Eagle County Open Space Program intended to acquire, maintain, and preserve lands in the County that possess values such as "fish and wildlife habitat," "public access to rivers and streams," and "cultural or historic values."  The Open Space Program is funded by a dedicated mill levy tax on property in the County.  The Program has preserved approximately 20,000 acres of land for open space in the County, with more being added.

23.     Eagle County has devoted significant resources to addressing the threats of climate change, particularly of wildfires, including wildfire mitigation in the form of vegetation

7

manipulation, fire resistant construction materials, water supply development, access improvement, and evacuation planning.  Eagle County has adopted wildfire regulations to reduce or minimize impacts of wildfire hazards on properties and its residents. Eagle County also adopted a Community Wildfire Protection Plan to coordinate wildfire protection and mitigation among the towns and fire districts under a single plan.

24.    The County's various environmental, land use, and other regulations have been established to protect the health, safety, and welfare of its citizens and to preserve and enhance the livability, aesthetic, and environmental quality of the County, which are some of the County's most valuable proprietary interests.  The County's powers to regulate and protect its natural and historic resources are essential to fulfill its legal duties and protect the quality of life in Eagle County, which in turn maintains property values and generates revenue necessary to sustain the County.

25.    In recent years, Eagle County has been concerned with risks posed by trains transporting oil through the Rocky Mountains and running through the County.  Miles-long oil trains hauling millions of gallons of oil through the County present risks of wrecks, derailments, wildfires, and oil spills.

26.    Eagle County has sought to protect its interests by participating in federal decisionmaking processes and environmental reviews, which are critical opportunities for the County to have a meaningful role in federal decisions.  For instance, in 2021, the County participated in the Surface Transportation Board's (STB) administrative process for authorizing the proposed Uinta Basin Railway, which is intended to facilitate the development of oil in Utah's Uinta Basin for transportation on the existing Union Pacific Line running through the County.

27.    Uinta Basin Railway trains carrying oil from Utah would use the Union Pacific Line through Eagle County and several western Colorado counties.  The Union Pacific Line is the only regularly used rail line to cross Colorado's Rocky Mountains, via a route that is known as the Moffat Tunnel Subdivision, and it runs directly adjacent to the Colorado River for many miles through Eagle County.

28. Eagle County successfully challenged the STB's authorization of the Uinta Basin Railway at the Court of Appeals for the D.C. Circuit. In that decision, the Court of Appeals held that the Board improperly failed to consider the environmental effects of the significant increase of rail traffic through Eagle County that would be caused by the proposed Railway. *See Eagle Cnty. v. STB*, 82 F.4th 1152 (D.C. Cir. 2023), *rev'd in part*, *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168 (2025).

29. Similar to the Uinta Basin Railway, the Wildcat Facility Expansion is intended to significantly increase the loading of oil trains at the Facility, which will cause a significant increase of oil trains travelling the Union Pacific Line through Eagle County, all the way to Denver, Colorado.

30. Concerned with risks of oil train traffic facilitated by the Wildcat Facility Expansion, Eagle County began reviewing and commenting on the BLM's proposed authorization of the Project in 2023. Eagle County submitted comments to BLM requesting that BLM prepare an environmental impact statement (EIS) for the Wildcat Facility Expansion with an opportunity for the County to review and comment on any draft environmental reviews. The County provided BLM with information on the Uinta Basin Railway and alerted BLM that the Wildcat Facility Expansion would present the same a range of environmental impacts reasonably likely to result from the proposed Project, including accidents and oil spills contaminating the Colorado River system, increased risk of wildfire ignition from oil trains, and increased congestion and potential for accidents at road–rail at-grade crossings.

31. BLM responded to Eagle County, stating that an environmental review of the project would be conducted under NEPA and that BLM would provide for public review and comment on the Project.

32. The Project review process fell dormant until the spring of 2025, when Eagle County heard news that BLM was again considering authorizing the Wildcat Facility Expansion, but now through an expedited "emergency" review and authorization process.

9

33.     Upon learning this news and on its own volition, in July 2025, Eagle County submitted renewed comments on the Project, again notifying BLM of the increased environmental risks that downline communities would endure from the Wildcat Facility's expansion. Eagle County also informed BLM that its use of the Alternative Arrangements was legally unsupported as Interior did not have authority to promulgate the Alternative Arrangements and was factually unsupported as there is no "energy emergency."

34.     BLM never notified the County of any opportunity for public comment on the Wildcat Facility Expansion, which BLM had previously committed to providing, nor did BLM provide any reason for its decision to not allow public review and comment. BLM never responded to Eagle County's unsolicited comments.

35.     In authorizing the Wildcat Facility Expansion, BLM failed to adequately evaluate the environmental impacts and public safety risks resulting from the increase in train traffic running through Eagle County. The environmental impacts of the significant increase in rail traffic under the Wildcat Facility Expansion and BLM's failure to adequately consider those impacts harm the County's ability to regulate, maintain, and protect its environment, communities, property, and economy.

36.     The significant increase in rail traffic caused by the Wildcat Facility Expansion harms Eagle County's communities and environment, including thousands of acres of public lands held by BLM and the County bordering the Union Pacific Line. Any crash, derailment, or oil spill would harm Eagle County's natural resources and would have a significant impact on the health and safety of the County's communities and its economy. For instance, virtually the entire portion of the Union Pacific Line located in Eagle County runs directly adjacent to the Colorado River. The River and its tributaries provide many outdoor recreation opportunities the County's residents, visitors, and tourists who use the River for rafting, fishing, and water recreation, wildlife viewing, and other activities, which may be enjoyed on public lands administered and managed by the BLM and Eagle County Open Space. Any crash, derailment, or oil spill of trains originating from the Facility could have a devastating impact on the River and would significantly

10

harm the recreational opportunities on the River that generate significant revenue for the County and local businesses.

37. In addition, the increased rail traffic due to the Wildcat Facility Expansion harms the County's ability to regulate and protect its environment and natural resources, such as the pristine forests through which the Union Pacific line runs and which are used for many other outdoor activities. Eagle County is harmed by the increased risk of wildfires from the significant increase in rail traffic coming from the Wildcat Facility Expansion and the impact of wildfires caused by sparks from the more-frequent trains or by ignition of the highly flammable crude oil being carried on the trains. The Wildcat Facility Expansion will increase the risk of wildfire in Eagle County due to both an increased number of trains and highly flammable cargo. That increase impairs the County's ability to prevent wildfires and diminishes the County's continuing, deliberate efforts to protect its communities and resources from wildfires.

38. The Wildcat Facility Expansion and the rail traffic will also harm the County's own properties along the Colorado River. These County properties are located adjacent to the Union Pacific Line and along the Colorado River and are intended to facilitate enjoyment of the River and surrounding environment. They will be negatively impacted by the significant increase in train traffic from the Wildcat Facility Expansion and the various environmental impacts of the trains that will disrupt the natural setting along the River and present significant environmental risks to the County's properties.

39. Eagle County is also harmed by Interior's issuance of unlawful Alternative Arrangements which have caused rushed, inadequate environmental reviews of projects including the Wildcat Facility Expansion that fail to adequately consider and mitigate the threats to Eagle County's interests. The Alternative Arrangements strips from the decisionmaking process the critical involvement of federal, state, and local governments and the input and information the public provides on the environmental effects of a proposed project. The lack of public participation in agency decisionmaking under the Alternative Arrangements harms the County's

11

ability to protect its interests in the County's resources, including its property, open space, and water resources.

40.    Eagle County's regulatory, economic, and proprietary interests are harmed by Interior's Alternative Arrangements and BLM's authorization of the Project which (1) adversely affect Eagle County's interests in and ability to regulate, manage, and protect its environment, resources, and communities, (2) negatively impacts the County's properties and resources, (3) negatively impact the County's economic interests, and (4) adversely affects the County's interest in participating in the federal decision-making processes. *See City of Jersey City v. Consol. Rail Corp.*, 668 F.3d 741, 744-46 (D.C. Cir. 2012) (finding harm to city's ability to protect its interests in the "historic and environmental value" of property under NEPA and the NHPA).

41.    Eagle County's injuries have been caused by Interior's unlawful Alternative Arrangements and BLM's authorization of the Wildcat Facility Expansion under the Alternative Arrangements that fails to comply with the federal environmental law. The relief requested herein, including vacatur of the Alternative Arrangements and the Wildcat Facility Expansion decision, would redress the County's injuries.

42.    In addition, as part of Eagle County's evaluation and involvement in Interior and BLM's decision challenged in this action, the County seeks agency records regarding BLM's authorization of the Wildcat Facility Expansion under FOIA.  Such records will enable the County to evaluate and take action regarding the Project.  At time of initiating this action, BLM has failed to timely produce public records that were properly requested and to which the County is entitled under FOIA.  *See Zivotofsky v. Sec'y of State,* 444 F.3d 614, 617-18 (D.C. Cir. 2006) ("The requester is injured-in-fact for standing purposes because he does not get what the statute entitles him to receive.").  The relief requested herein, including ordering BLM to produce the records requested by the County, would redress the County's injuries.

43.     **Defendant Department of the Interior.**  Interior is a federal agency responsible for managing about 500 million acres of federal public lands across the United States.  The Department of the Interior, through its sub-agency BLM, is charged with managing the public lands upon which the Wildcat Facility's right-of-way is located, and decides whether to approve activities necessary for road construction on land it administers, including rights-of-way.  Interior issued the Alternative Arrangements challenged in this proceeding.

44.     **Defendant Bureau of Land Management.**  BLM is a federal agency within the Department of the Interior.  BLM has been delegated Interior's authority to manage the public lands on which the right-of-way is located by conducting and implementing FLPMA and NEPA assessments and procedures, and deciding whether to approve the Project.

45.     BLM issued the Decision Record approving the Wildcat Facility Expansion (Decision Record) as well environmental documentation supporting its decision, namely the Finding of No Significant Impact (FONSI) and the Final Environmental Assessment.  BLM, DOI-BLM-UT-G020-2025-0015-EA, *Decision Record* at 1 (July 2025), attached as Exhibit A; BLM, DOI-BLM-UT-G020-2025-0015-EA, *Finding of No Significant Impact* (July 2025), attached as Exhibit B; BLM, DOI-BLM-UT-2025-0015-EA, *Wildcat Loadout Facility Right-of-Way Amendment Environmental Assessment*, at 4 (July 2025) (Final Environmental Assessment), attached as Exhibit C.[3]

46.     BLM is a federal agency within Interior and is subject to FOIA pursuant to 5 U.S.C. § 552(f).

---

[3] BLM presented the Decision Record as the authorization of the Wildcat Facility Expansion although there could be additional documents issued by BLM as part of the right-of-way authorization.  However, BLM has not publicly circulated any other authorizing documents.

## LEGAL BACKGROUND

**A.     Federal Land Policy and Management Act**

47.     BLM manages public lands under FLPMA.  *See* 43 U.S.C. §§ 1701–87.  FLPMA directs BLM to manage public lands to "protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archaeological values" in such a way that will "provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use."  *Id.* § 1701(a)(8).

48.     In managing public lands, BLM must "take any action necessary to prevent unnecessary or undue degradation" of public lands.  *Id.* § 1732(b).

### 1.  FLPMA requires public involvement in BLM's right-of-way decisions and any associated environmental review.

49.     FLPMA requires BLM to seek public involvement in its management of public lands by requiring BLM to "give the Federal, State, and local governments and the public adequate notice and an opportunity to comment upon the formulation of standards and criteria for, and to participate in, the preparation and execution of plans and programs for, and *the management of*, the public lands."  *Id.* § 1739(e) (emphasis added).

50.     Signifying its importance, FLPMA defines "public involvement" as "the opportunity for participation by affected citizens in rulemaking, decisionmaking, and planning with respect to public lands, including public meetings or hearings held at locations near the affected lands, or advisory mechanisms, or such other procedures as may be necessary to provide public comment in a particular instance."  *Id.* § 1702(d).

51.     FLPMA regulations reinforce the importance of public involvement in land use decisions by requiring that BLM "must, to the extent practicable, provide for public notification and public involvement when an environmental assessment is being prepared."  43 C.F.R. § 46.305(a).

52.     Public involvement solicited by BLM shall be meaningful: "[t]he bureau must consider comments that are timely received, whether specifically solicited or not."  *Id.* §

14

46.305(a)(1). Public involvement must be fashioned to "permit members of the public to weigh in with their views and thus inform the agency decision-making process," and the public participation period "must be sufficiently long to permit members of the public to weigh in on the decision in an informed manner." *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 38 (9th Cir. 2025) (citation omitted).

53. Interior's regulations implementing NEPA reinforce public involvement as a critical component of the agency's decisionmaking. The agency must "use a consensus-based management approach to the NEPA process" whenever practicable. 43 C.F.R. § 46.110(c). Consensus-based management "incorporates direct community involvement in consideration of bureau activities subject to NEPA analyses, from initial scoping to implementation of the bureau decision. It seeks to achieve agreement from diverse interests on the goals of, purposes of, and needs for bureau plans and activities, as well as methods anticipated to carry out those plans and activities." *Id.* § 46.110(a).

54. Consensus-based management "involves outreach to persons, organizations or communities who may be interested in or affected by a proposed action with an assurance that their input will be given consideration by the Responsible Official in selecting a course of action." *Id.*

55. Further mandating public participation on BLM's right-of-way decisions, the BLM NEPA handbook confirms that the BLM "must have some form of public involvement in the preparation of all [environmental assessments]." BLM, NEPA Handbook H-1790-1, at ch. 8.2 (Jan. 30, 2008).

**2. BLM's right-of-way decisions must be in the public interest.**

56. BLM's authority to grant, renew, issue, or otherwise amend a right-of-way is limited to rights-of-way that "require" the use of public lands and "are in the public interest." 43 U.S.C. § 1761(a)(7) (authorizing rights-of-way for "such other necessary transportation or other systems or facilities which are in the public interest and which require rights-of-way over, upon,

under, or through such lands."); 43 C.F.R. § 2801.6(a)(1) ("grants . . . that are in the public interest and require the use of public lands").

57.     A granted right-of-way comes with obligations in the form of terms and conditions that must (1) carry out the purposes of FLPMA and its regulations; (2) "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment;" (3) mandate compliance with applicable Federal or State air and water quality standards; and (4) require compliance with the most stringent State or Federal "standards for public health and safety, environmental protection, and siting, construction, operation, and maintenance of or for rights-of-way for similar purposes." 43 U.S.C. § 1765(a).

58.     BLM's stated objective in granting rights-of-way is to manage the use of rights-of-way on public lands in a manner that protects the natural resources of public lands, "prevents unnecessary or undue degradation to public lands," promotes the use of rights-of-way in common, and "[c]oordinates, to the fullest extent possible, all BLM actions [in issuing rights-of-way] with state and local governments, interested individuals, and appropriate quasi-public entities." 43 C.R.F. § 2801.2.

59.     BLM must deny a right-of-way application or amendments that are inconsistent with BLM's purpose for managing public lands, if the use is not in the public interest, or if granting the ROW would otherwise be inconsistent with FLPMA and its regulations or other laws. *Id*. § 2804.26(a).

## B.    National Environmental Policy Act

60.     NEPA was "designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment." *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772 (1983). NEPA requires federal agencies to take a "hard look" at environmental consequences and ensures that BLM "consider[s] every significant aspect of the environmental impact of a proposed action" and "inform[s] the public that it has indeed considered environmental concerns." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462

16

U.S. 87, 97 (1983).  To that end, NEPA requires federal agencies to prepare a "detailed statement" covering the "reasonably foreseeable environmental effects of the proposed agency action" when it takes "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).

61.     Where the significance of the effects of a proposed agency action is not known, federal agencies are required to prepare an environmental assessment document.  *Id*. § 4336(b).

62.     The D.C. Circuit has long held that under NEPA, federal agencies "must consider not only the direct effects, but also the indirect environmental effects" of a project.  *Sierra Club v. FERC*, 867 F.3d 1357, 1371 (D.C. Cir. 2017) (emphasis omitted).  Indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Birckhead v. FERC*, 925 F.3d 510, 517 (D.C. Cir. 2019) (quoting former NEPA regulation).

63.     The Supreme Court recently affirmed the requirement to consider "indirect effects" under NEPA, while clarifying that agencies do not need to consider "other future or geographically separate projects that may be built (or expanded) as a result of or in the wake of the immediate project under consideration."  *Seven Cnty.*, 605 U.S. at 187.  This requirement is consistent with the long-held proposition that NEPA's expansive language is to "be read to include a requirement of a reasonably close causal relationship between a change in the physical environment and the effect at issue."  *Metro. Edison Co.*, 460 U.S. at 774.

64.     The Supreme Court makes clear that "the environmental effects of the project at issue may fall within NEPA even if those effects might extend outside the geographical territory of the project or might materialize later in time."  *Seven Cnty.*, 605 U.S. at 187.  In *Seven County*, the Supreme Court also clarified the "substantial deference" that should be afforded to agency choices in assessing significant environmental effects and feasible alternatives under NEPA "so long as they fall within a broad zone of reasonableness."  *Id*. at 183.  Thus, there remain clear limits to deference under NEPA, and this Court has held that "we do not defer to the agency's

17

conclusory or unsupported suppositions." *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004).

### C.    Interior's Emergency Procedures and NEPA Review

65.    Interior's regulations provide emergency authority to adjust standard NEPA procedures where action is needed to address immediate threat to life, property, or important natural, cultural, or historic resources. *See* 43 C.F.R. § 46.150.

66.    Interior's authority to invoke an emergency response to take action under emergency procedures for NEPA compliance is limited and the extent to which NEPA procedures may be adjusted in light of an emergency depends on whether the responsive actions are urgently needed to mitigate harm. *Id.*

67.    Interior's emergency response procedures, which are to be read "in conjunction with and supplementary to" NEPA, *see* Implementation of the National Environmental Policy Act (NEPA) of 1969, 73 Fed. Reg. 61,292, 61,292 (Oct. 15, 2008) (codified at 43 C.F.R. pt. 46), apply "only if . . . an emergency exists that makes it necessary to take urgently needed actions before preparing a NEPA analysis and documentation," 43 C.F.R. § 46.150(a).

68.    As a prerequisite to initiating the emergency procedures, the Interior's "Responsible Official" must first make a written determination that an emergency exists, at the time the emergency exists, that makes it necessary to take urgently needed responsive actions without first fully complying with NEPA. *Id.* § 46.150(b).

69.    The Interior defines an "emergency" as "a sudden, urgent, usually unexpected occurrence or occasion requiring immediate action" or "an unforeseen combination of circumstances or the resulting state that calls for immediate action." 73 Fed. Reg. at 61,292.

70.    If, using this definition, an emergency determination is made, the Responsible Official's authority to act prior to complying with NEPA is limited to those actions (1) necessary to control, (2) the immediate impacts, of (3) the emergency that are, (4) urgently needed, (5) to mitigate harm to (6) life, property, or important natural, cultural, or historic resources. 43 C.F.R.

18

§ 46.150(a). When taking these urgently needed actions to mitigate harm, the Responsible Official must describe in writing the responsive actions taken, consider the "probable environmental consequences of the actions," and "mitigate foreseeable adverse environmental effects to the extent practical." *Id.* § 46.150(a)–(b).

71.  If, beyond these urgently needed responsive actions to mitigate harm, Interior proposes to take "subsequent actions related to the emergency," the Responsible Official has two options depending on whether these subsequent actions will have a significant environmental impact. *Id.* § 46.150(c)–(d). Where the subsequent actions are not likely to have a significant environmental impact, the Responsible Official must document that determination in an environmental assessment and, absent a categorical exclusion, a Finding of No Significant Impact (commonly referred to as a FONSI). *Id*. § 46.150(c).

72.  If the nature and scope of the subsequent actions require taking action before these NEPA steps can be taken, the Responsible Official must consult with the Interior's Office of Environmental Policy and Compliance about alternative arrangements for NEPA compliance for these proposed subsequent actions. *Id.* And where the subsequent actions are likely to have a significant environmental impact, the emergency procedures may be used in consultation with the Office of Environmental Policy and Compliance, but are only applicable to subsequent actions taken that are "necessary to control the immediate impacts of the emergency." *Id.* § 46.150(d).

73.  All other actions, that is, actions that are not (1) necessary to address the (2) immediate impacts of the (3) emergency, whether urgently needed to mitigate harm or subsequently taken, are subject to Interior's standard NEPA procedures. *Id.* § 46.150(d); *see also* 40 C.F.R. § 1506.11 (2024) (stating that alternative arrangements are limited to "actions necessary to control the immediate impacts of the emergency").

**D.  The National Energy Emergency Executive Order and Interior's Alternative Arrangements for NEPA Compliance**

74.  On January 20, 2025, the President issued the Executive Order, "Declaring a National Energy Emergency," invoking authority under the National Emergencies Act, 50 U.S.C.

§§ 1601–51, and declaring a "national energy emergency." Exec. Order No. 14,156, 90 Fed. Reg. 8,433 (Jan. 29, 2025), attached as Exhibit D.

75.    The Executive Order's declaration of a "National Energy Emergency" alleges that there is a shortage of energy supplies and that the Nation suffers from an "unreliable" grid, creating an "energy emergency." *Id.* It also states that "energy and critical minerals" "identification, leasing, development, production, transportation, refining, and generation capacity of the United States are all far too inadequate to meet our Nation's needs." *Id.* The Executive Order does not cite any facts or evidence to support these allegations.

76.    Some immediate impacts of this purported "emergency" that can be gleaned from the Executive Order include: "high energy prices;" "constraints on foreign policy;" a "precariously inadequate and intermittent energy supply, and an increasingly unreliable grid;" "vulnerab[ility] to hostile foreign actors;" and "an imminent and growing threat to the United States' prosperity and national security." *Id.*

77.    Contrary to the Executive Order's representations, the United States is producing record quantities of crude oil, and experts predict production levels to remain at this record level through at least 2026. *See* U.S. Energy Information Administration, Short-Term Energy Outlook (Nov. 12, 2025) (surpassing thirteen million barrels per day since 2024).[4]

78.    In response to the President's declaration of a "National Energy Emergency," Interior announced that it would implement emergency permitting procedures to "accelerate the development of domestic energy resources and critical minerals." Press Release, Department of the Interior, Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply (Apr. 23, 2025), attached as Exhibit E. Interior stated that it would be adopting "an alternative National Environmental Policy Act compliance process to allow for more concise documents and a compressed timeline." *Id.*

---

[4] *Available at* https://www.eia.gov/outlooks/steo/data/browser.

79.     In that same press release announcing for the first time Interior's intent to adopt what it calls "Alternative Arrangements," Interior included a hyperlink to a document that is titled "Alternative Arrangement for NEPA Compliance."  Department of the Interior, Alternative Arrangements for NEPA Compliance (Apr. 23, 2025), attached as Exhibit F.

80.     Interior did not publish notice of the proposed Alternative Arrangements in the Federal Register.

81.     Interior did not provide interested parties an opportunity to participate in the development of the Alternative Arrangements, including through public comments.  As a result, Interior did not consider any public comments in adopting the Alternative Arrangements.

82.     The Alternative Arrangements, which have subsequently been applied to projects by BLM, do not contain a statement of basis and purpose and were not published in the Federal Register thirty days before they went into effect.

83.     The Alternative Arrangements recite the President's declaration of a "national energy emergency" as the basis for invoking emergency response procedures and direct Interior to "identify and exercise any lawful emergency authorities . . . to facilitate the identification, leasing, siting, production, transportation, refining, and generation of domestic energy resources, including, but not limited to, on Federal lands."  *See* Alternative Arrangements at 1.

84.     Interior states in the Alternative Arrangements that it is acting pursuant to Interior's emergency procedures under NEPA set forth in 43 C.F.R. § 46.150.  *Id.*

85.     To opt in to the "Alternative Arrangements," proponents of energy-related projects must apply for "coverage" of the NEPA review of their project under the Alternative Arrangements.  *Id.* at 1, 2.

86.     Under the Alternative Arrangements, for those with projects not likely to have a significant environmental impact, the Responsible Official will prepare an environmental assessment, and if appropriate, a FONSI, within fourteen days of receipt of the complete application.  *Id.* at 2.  The final environmental assessment and FONSI will be published on a public website.  *Id.*

21

87. Public notice and comment is not required prior to finalizing the environmental assessment and FONSI or "any decision." *Id.*

88. For energy projects that are likely to have a significant environmental impact, the Responsible Official will follow guidance issued by the Council on Environmental Quality (CEQ) on April 23, 2025, also in response to the President's declaration of an "energy emergency." *Id.* That CEQ guidance requires the Responsible Official to publish a notice of intent to prepare an environmental impact statement on a public website to solicit written comments and announce a public meeting. *Id.*

89. The environmental impact statement will be prepared by the Responsible Official within approximately twenty-eight days of publishing the notice of intent. *Id.*

90. The "Responsible Official is not required to publish a draft environmental impact statement prior to finalizing the environmental impact statement and any record of decision." *Id.* If an environmental impact statement is published for public comment, the Alternative Arrangements identify that comment periods for these environmental impact statements will be a truncated ten days. *Id.*

91. Under the Alternative Arrangements, "[o]nly the Assistant Secretary – Land and Minerals Management, Deputy Secretary of the Interior, Secretary of the Interior, their acting equivalents, or those officials exercising the delegated authority of these positions may approve coverage of an application by alternative arrangements for NEPA compliance, and only those officials may issue a decision to approve an application or otherwise take action covered by such [A]lternative [A]rrangements." *Id.*

92. Any approval of a project under the Alternative Arrangements must "document how the action addresses the national energy emergency." *Id.*

93. Interior's Alternative Arrangements purport to satisfy Interior's emergency procedures under 43 C.F.R. § 46.150(b) in a conclusory fashion, but the document does not contain a determination by the Responsible Official that an emergency exists and instead recites the Executive Order as the basis for the Alternative Arrangements. *See id.* at 3.

94.     Adam Suess, Acting Assistant Secretary of Land and Minerals Management, Eva Vrana, Deputy Assistant Secretary, and Karen Budd-Falen, Acting Deputy Secretary, approved and signed the Alternative Arrangements on behalf of Interior. *See id.*

95.     The Alternative Arrangements and the Executive Order have been the subject of significant criticism as they can be used to "circumvent NEPA and shut[ting] the public out of energy approval processes," which would "compromise the quality and integrity of Interior's decision making and lead to worse outcomes for communities and the environment." Earthjustice Comments on National Environmental Policy Act Implementing Regulations, at 74 (Aug. 1, 2025), attached as Exhibit G.

**E.      Administrative Procedure Act**

96.     The APA governs judicial review of agency actions and provides a right to judicial review for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702.

97.     The APA directs courts to "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions must also be set aside as arbitrary and capricious if the agency has acted "without observance of procedure required by law," *id.* § 706(2)(D), or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

98.     An agency's action is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

99.     When promulgating rules, agencies must follow the procedures set forth in the APA. The agency must publish a notice of proposed rulemaking in the Federal Register, provide

23

interested persons an opportunity to participate in the rulemaking through comments that the agency must consider, and a final rule must contain a statement of its basis and purposes and be published in the Federal Register at least thirty days before the rule goes into effect.  5 U.S.C. § 553(b)–(d).  Courts must set aside agency rulemakings that fail to follow these procedures.

100.    Judicial review of agency actions under NEPA and FLPMA are governed by the APA.  *See, e.g.*, *Tulare Cnty. v. Bush*, 306 F.3d 1138, 1143 (D.C. Cir. 2002) (NEPA); *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 753 (D.C. Cir. 2007) (FLPMA).

### F.    The Freedom of Information Act

101.    FOIA requires a federal agency to make public records "promptly available"— subject to enumerated exemptions—to any party who makes a request that reasonably describes the records sought and complies with the agency's rules for making the request.  5 U.S.C. § 552(a)(3)(A).

102.    FOIA requires the agency to issue a determination on a FOIA request within twenty working days from the date of receipt.  *Id.* § 552(a)(6)(A)(i).

103.    The agency's determination on a FOIA request shall contain (1) the agency's determination of whether to comply with the request and provide responsive records, (2) the reasons for the agency's determination, and (3) notice of the right of the requester to appeal an adverse determination to the head of the agency.  *Id.*

104.    Mere notice of the agency's receipt of the request does not suffice for a "determination," nor is it enough that "within the relevant time period, the agency simply decide to later decide."  *Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 711 F.3d 180, 186 (D.C. Cir. 2013).  Instead, "the agency must at least inform the requester of the scope of the documents that the agency will produce, as well as the scope of the documents that the agency plans to withhold under any FOIA exemptions."  *Id.*  Specifically, the agency must "at least: (i) gather and review the documents; (ii) determine and communicate the scope of the documents it

intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse." *Id.* at 188.

105.    FOIA allows the agency to extend the twenty-working-day deadline by up to ten additional working days for "unusual circumstances" by providing written notice to the requester that describes the "unusual circumstances" and provides the date on which the determination is expected to be issued. *Id.* § 552(a)(6)(B)(i).

106.    If the agency fails to comply with FOIA's statutory deadline for issuing a determination on a request, the requester is deemed to have exhausted its administrative remedies and may file suit against the agency. *Id.* § 552(a)(6)(C)(i).

107.    The agency bears the burden to prove the legality of its actions under FOIA. *Id.* § 552(a)(4)(B).

108.    FOIA grants jurisdiction to the court "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *Id.*

109.    Under FOIA, this Court may assess attorney fees and costs against the United States if Eagle County substantially prevails in this action. *Id.* § 552(a)(4)(E).

## FACTUAL BACKGROUND

**A.    The Wildcat Facility is used to load oil trains to be transported on the interstate rail network.**

110.    The Wildcat Facility, located in Carbon County, Utah, was historically used as a facility to load coal onto railcars for transportation by rail to other destinations, but it no longer serves that purpose. *See* Exhibit C at 4. Instead, in recent years the Wildcat Facility has been used to transfer from truck to railcar—or "transload"—waxy crude oil trucked from Utah's oil-rich Uinta Basin 100 miles away, which is then delivered by trains from the Facility to Gulf Coast oil refineries in Texas and Louisiana. *Id.* at 35; BLM Questions to Coal Energy Group Regarding Wildcat Loadout, at 5–6 (Mar. 15, 2023), attached as Exhibit H.

111. Oil transloading at the Wildcat Facility has coincided with a rebounding boom in oil production in the Uinta Basin enabled by the adoption of new techniques, including horizontal drilling and hydraulic fracturing, used to exploit previously unobtainable oil. Exhibit C at 75.[5]

112. Oil transloading at the Wildcat Facility is operated by Coal Energy, which is controlled by Wildcat Midstream Limited Partnership, "a partnership backed by two financially healthy upstream producers in the Uinta Basin." Coal Energy Group 2, LLC, BLM ROW Amendment Application, Standard Form 299, at 1 (Apr. 3, 2023), attached as Exhibit J; Utah Div. of Corps. & Com. Code, Coal Energy Grp. 2 LLC, Foreign Registration Statement (2020), attached as Exhibit K.

113. Coal Energy asserts that it currently loads approximately 20,000 barrels of oil onto 35 oil tanker railcars daily at the Wildcat Facility. Exhibit C at 26. Coal Energy's own data reflects its daily output averaged 25 railcar-loads in 2022, 11 railcar-loads in 2021, three railcar-loads in 2020, and no carloads from 2016 to 2019. *Id*. at 40–41; *see also* Wildcat Midstream 2021 Thruput Report, attached as Exhibit L.

114. Once the 35 railcars are loaded with oil at the Wildcat Facility, they are assembled into a unit and are transported daily to a rail yard known as Martin Yard, located approximately six miles north on the outskirts of a community called Helper, Utah. *See* Exhibit C at 5, 19. Transportation of the loaded railcars occurs on a railroad line (the Utah Railway Line) connecting the Facility and Martin Yard that is owned by Utah Railway, a common carrier railroad. *See Utah Ry. Co.—Discontinuance of Service Exemption—In Carbon and Emery Counties, Utah*, AB 310 (Sub-No. 3X), slip op. at 1 (STB served Dec. 17, 2021), attached as Exhibit M.

115. At Martin Yard, the railcars are assembled into a longer train consisting of 104 oil tanker railcars, which is the maximum number of railcars that can be transported by one train on the rail routes. Exhibit C at 5, 19. Martin Yard can hold two fully assembled, loaded oil trains

---

[5] *See also Crude Oil Production*, Utah Office of Energy Development, https://geology.utah.gov/apps/energy-resources/petroleum/?page=Crude-Oil-Production (last visited March 3, 2026), attached as Exhibit I.

with additional space for other railcars if needed.  *Id*. at 19.  Empty railcars at Martin Yard are returned to the Wildcat Facility and can be stored on a portion of the Utah Railway Line south of the Facility.  *Id*.  The Utah Railway Line and Martin Yard are part of the interstate rail network.  Exhibit M at 3 n.7.

### B.    Railcars transloaded at the Wildcat Facility travel alongside the Colorado River and through BLM-managed land in Eagle County.

116.    Oil trains depart Martin Yard on the Utah Railway Line and travel a quarter mile to connect with the Union Pacific Line.  Exhibit C at 19.  The Union Pacific Line extends approximately 500 miles eastward through Eagle County to Denver, Colorado, where it connects with the rest of the interstate rail network.[6]

117.    The Union Pacific Line serves as the only active east–west rail line between Utah and Colorado, and is the most direct route between the Wildcat Facility and the Gulf Coast oil refineries in Texas and Louisiana that are the oil's destination.  *See* Coal Energy Presentation Slides for BLM Meeting March 7, 2023, at 3, attached at Exhibit N; Surface Transportation Board, Uinta Basin Railway Final Environmental Impact Statement, Appendix C at C-3 to C-4 (Aug. 2021), attached as Exhibit O.

118.    For hundreds of miles along the Union Pacific Line, including through Eagle County, the railcars transloaded at the Wildcat Facility travel mere feet from the Colorado River, which supports tens of millions people in the Western United States, and serves as the economic lifeblood for communities, farms, and businesses.  *See* Eagle County Comments to BLM re: Coal Energy ROW Amendment Dated July 27, 2023, at 4, attached as Exhibit P.

119.    Oil trains loaded at the Wildcat Facility also travel downline through hundreds of thousands of acres of federal public land while on the Union Pacific Line.  *Id.* at 1.  Much of the land that the Wildcat Facility's oil tanker railcars pass as they traverse Eagle County and other jurisdictions along the Union Pacific Line contain vegetation that is highly or moderately likely to

---

[6] Westward of Martin Yard, the Union Pacific Line connects to Provo and Salt Lake City, with further connections to the interstate rail network.  For the purposes of this Complaint, the Union Pacific Line refers only to the 500-mile segment between Helper, Utah and Denver, Colorado.

catch fire.[7]  Scientists predict that drought and wildfire risks will increase in places such as those along the Union Pacific Line.  *See* Becky Bolinger et al., *Climate Change in Colorado*, at 68 (3d ed. Colo. State Univ., 2024), attached as Exhibit R.

120.     Within Eagle County, the Union Pacific Line travels alongside the Colorado River through the Upper Colorado River Special Recreation Management Area, which BLM administers.  *See* BLM, BLM/CO/Gl-15/011, *Upper Colorado River Guide*, at 1 (2015), attached as Exhibit S; *see also* BLM, *Upper Colorado River SRMA – Colorado River Valley Field Office* (2017), attached as Exhibit T (map showing the coverage of the Upper Colorado River Special Recreation Management Area).

121.     As BLM's own materials state, "[t]he Upper Colorado River Recreation Area spans a unique and beautiful landscape, known for its diverse water features, abundant wildlife, and cultural landscapes along the Colorado River Headwaters Scenic Byway."[8]  The Upper Colorado River Special Recreation Management Area protects known habitat and populations of threatened, endangered, and sensitive species.  BLM, DOI-BLM-CO-N020-2024-0003, *Proposed Withdrawal for the Upper Colorado River Special Recreation Management Area, Environmental Assessment*, at 6-7 (Apr. 2024), attached as Exhibit V.

122.     The Union Pacific Line has a long history of train derailments.  For instance, between 1992 and 1998, the Union Pacific Line was among the locations in Utah and Colorado that experienced seven derailments that caused releases of diesel fuel, taconite, and sulfuric acid into rivers adjacent to the railroad serious enough to trigger an enforcement action under the Clean Water Act.[9]  Union Pacific entered into a consent decree with the U.S. Department of Justice in 2000 that required the railroad to pay $800,000 in fines and institute a number of

---

[7] *Wildfire Risk Viewer*, Colo. State Forest Serv., https://co-pub.coloradoforestatlas.org/#/ (last visited March 3, 2026), attached as Exhibit Q.

[8] *Upper Colorado River Recreation Area, Colorado*, BLM, https://www.blm.gov/visit/upper-colorado-river-recreation-area (last visited March 3, 2026), attached as Exhibit U.

[9] U.S. Dep't of Just., Press Release, U.S. Settles Environmental Claims with Union Pacific Railroad (June 8, 2000), attached as Exhibit W.

operating safety measures. *United States v. S. Pac. Transp. Co.*, Dep't of Just., Notice of Lodging of Consent Decree Under the Sections 309(b) and 311(b) of the Clean Water Act, 65 Fed. Reg. 38,574 (June 21, 2000), attached as Exhibit X.

**C.** **In 2014, after conducting an environmental assessment under NEPA, including with public review and comment, BLM approved the Wildcat Facility to transload oil.**

123. The Wildcat Facility is located on public lands administered by BLM. Federal law requires the Facility's operator to seek authorization to operate the Facility through obtaining a right-of-way from BLM.

124. BLM originally granted the right-of-way for the Wildcat Facility in 1982 for the limited purpose of preparing and loading coal onto railcars. BLM, DOI-BLM-UT-G021-2013-063-EA, *Wildcat Loadout Modification Decision Record and Environmental Assessment*, at 14 (Sept. 5, 2014), attached as Exhibit Y.

125. Prior to 2014, the right-of-way authorizing use of the Wildcat Facility for preparing and loading coal did not grant use for transloading oil. *Id.*; Exhibit C at 40. In order to permit the Facility to transload oil, an amendment of the right-of-way was required. Despite this, oil transloading began in 2013. Exhibit C at 40. Coal Energy asserts that the oil transloading conducted in 2013 and 2014 prior to amendment of the right-of-way was permitted under 43 C.F.R. § 2801.5(b) because it was "casual." *Id.*

126. In 2014, the Wildcat Facility's owner requested authority from BLM to amend the right-of-way to permit oil transloading and storage equipment and facilities on a portion of the Facility, and to be permitted to transload initially 6,000 barrels a day with a maximum of up to 20,000 barrels of oil per day. Exhibit Y at 14, 19–20, 25.

127. The amendment to the right-of-way would authorize oil transloading at the Wildcat Facility for the first time, but BLM would limit the transloading of oil onto trains at the Wildcat Facility to 20,000 barrels of oil per day and therefore limit the number of oil trains traveling on the Union Pacific Line through public lands and Eagle County.

128.    Under NEPA, BLM prepared an environmental assessment (the 2014 Environmental Assessment) as part of the right-of-way amendment approval process. *Id.* at 14. The 2014 Environmental Assessment disclosed that under the ongoing unpermitted transloading operations at the time "railcars are loaded with crude oil are then shipped to terminal refineries along the Gulf Coast, West Coast, and other locations within the railroad system." *Id.* at 19.

129.    Recognizing the environmental effects of the Wildcat Facility's rail traffic, the 2014 Environmental Assessment noted that "additional NEPA analysis may be required if the loading rate were to exceed 20,000 barrels per day." *Id.* at 25.

130.    Several Utah conservation organizations commented on the draft of the 2014 Environmental Assessment expressing concerns about the environmental impacts of an oil transloading facility. *See S. Utah Wilderness All. et al.*, IBLA No. 2024-183, Appellants' Statement of Reasons, at 5 (Decided Sept. 13, 2024), attached as Exhibit Z.

131.    So did the U.S. Environmental Protection Agency, who was concerned with the Wildcat Facility, stating that "a[n] [oil] spill reaching water bodies is a serious risk that should be fully analyzed in the NEPA process." EPA Comments on Wildcat Loadout Modification Environmental Assessment, at 2 (June 5, 2014), attached as Exhibit AA.

132.    In 2022, BLM approved an increase in Facility oil "throughput" from 20,000 to 30,000 barrels of oil a day without public input through its categorical exclusion procedures, but this decision was challenged by environmental organizations and ultimately vacated upon BLM's request. *S. Utah Wilderness All. et al.*, IBLA No. 2024-183, Order, at 4 (Decided June 12, 2025), attached as Exhibit BB.

**D.     In 2023, BLM received and began considering a proposal to expand Wildcat Facility transloading throughput by 400%, all for transport through Colorado and Eagle County.**

133.    In April 2023, Coal Energy filed an application (2023 Application) to amend and expand the Wildcat Facility's right-of-way to allow for installation of new oil transloading facilities and equipment to enable increased throughput of "[u]p to a maximum of 100,000 barrels

30

per day" (the Wildcat Facility Expansion).  Exhibit J at 1.  In support of a "statement of need for [the Wildcat Facility Expansion]," the 2023 Application stated that "Wildcat Midstream Limited Partnership desires to expand its business to provide the market with a cost effective product," and that there was "[h]igh demand for product."  *Id*.

134.    In support of the Wildcat Facility Expansion, Coal Energy officials indicated that "Uinta Basin production is expected to increase by an additional 100,000 BPD [barrels per day] in 5 years."  Exhibit N at 1.  Because in-state refining capacity was already exceeded, Coal Energy asserted to BLM that "[e]xcess production must be exported" and that "[a]dditional export capacity needs to be built ASAP to meet projected wax growth."  *Id*.

135.    Coal Energy's consultants also asserted to BLM that truck traffic transporting oil to the Wildcat Facility would be "routed from the Uinta Basin," not re-routed trucks "that are already transporting the wax to different facilities."  Email exchange between Amar R. Patel and Joseph Palma re: Wildcat Loadout (Jan. 31 – Feb. 1, 2023), at 2, attached as Exhibit CC.

136.    Coal Energy provided BLM detailed information on where the Wildcat Facility's oil trains would transport oil after being transloaded.  Coal Energy informed BLM that the Wildcat Facility's oil train traffic is routed via the Union Pacific Line and that "[e]xpansion of the Wildcat Terminal is crucial to meet demand for Uinta Basin wax from US Gulf Coast refineries."  Exhibit N at 2–3.

137.    Coal Energy communicated to BLM that "[a]t this time all products are shipping to the USGC [U.S. Gulf Coast]" and that "[t]he current route" for oil trains is the Union Pacific Line from "Helper > Grand Junction > Denver > Kansas City and then turn south to LA or TX depending on final destination."  Email exchange between Joe Shotwell and Stephanie J. Howard (May 3 – July 5, 2023), at 1, attached as Exhibit DD.

138.    BLM began preparing an environmental assessment under NEPA for the proposed Wildcat Facility Expansion and BLM determined the environmental assessment required public notice and comment.  On March 31, 2023, BLM notified Coal Energy that an environmental assessment under NEPA for the Wildcat Facility Expansion would "go out for public review and

31

comment." Email exchange between Kyle Beagley and Joe Shotwell (March 28 – Apr. 14, 2023), at 4, attached as Exhibit EE.

139. Soon after, draft sections of an environmental assessment for the Wildcat Facility Expansion were traded between BLM and Coal Energy. *See* Email exchange between Joe Shotwell and Joseph Palma (June 8, 2023), with attachment entitled Wildcat Loadout Draft EA (subsequently redacted by BLM), attached as Exhibit FF.

140. Acknowledging the public interest in the proposed Wildcat Facility Expansion, BLM staff confirmed in writing to Eagle County officials that "[t]here will be an opportunity for you to review the [d]raft [environmental assessment] and comment on it." Email from Molly M Hocanson to Marcia Gilles (July 5, 2023), attached as Exhibit GG.

141. Based on the conclusion that the Wildcat Facility Expansion "is looking to increase the amount of oil transported out of the Uinta Basin to refineries on the Gulf Coast," BLM requested information from Coal Energy in order to assess the environmental effects of oil trains transloaded at the Facility. Email exchange between Brandon McDowell and Adam L Deppe (May 9, 2023), at 2, attached as Exhibit HH.

142. To consider the effects of the projected increase in train traffic based on the 2023 Application, BLM wrote to Coal Energy referencing rail traffic analysis from a 2021 Environmental Impact Statement conducted by the STB for the Uinta Basin Railway (the Uinta EIS). Email exchange between Stephanie J. Howard and Joe Shotwell (July 14, 2023), attached as Exhibit II.

143. The Uinta EIS identified that new oil train traffic created by the proposed railroad project would travel on the Union Pacific Line to Gulf Coast refineries in Texas and Louisiana, and evaluated environmental impacts caused by the additional Union Pacific Line traffic. Exhibit O at C-3 to C-4.

144. BLM determined that under NEPA, the effects of the significant increase in oil trains on the Union Pacific Line proposed to be loaded under the Wildcat Facility Expansion

32

should be analyzed like the effects of rail traffic were evaluated for the Uinta Basin Railway.  *See* Exhibit II.

145.    BLM planned to conduct a similar analysis of the Wildcat Facility's rail traffic on rail traffic downline on the same Union Pacific Line.  BLM officials noted to Coal Energy officials that "[t]he Uinta Basin Railway analyzed it in terms of trains per day and accidents per year," and noted "a similar approach for [the W]ildcat [Facility] would be ideal."  *Id*.

146.    Informed of the BLM's consideration of the Wildcat Facility Expansion, Eagle County wrote to BLM on July 27, 2023, stating that "[o]il trains transporting waxy crude oil from the Uinta Basin across Colorado through Eagle County—and the significant environmental effects of that rail traffic—demand a comprehensive analysis of the [Wildcat Facility Expansion] in an EIS."  Exhibit P at 2.

147.    Eagle County identified a range of environmental impacts that NEPA required BLM to analyze, including from oil train accidents and explosions, accidents and spills contaminating the Colorado River system, increased threat of ignition of wildfires from oil trains, and increased congestion and potential for accidents at road–rail at-grade crossings.  *Id*.  Eagle County requested that BLM prepare an EIS.  *Id*.

148.    BLM received requests to complete an EIS from others as well, including concerned environmental groups, Colorado elected officials, and local communities located along the Union Pacific Line.  *See* Letter from 350 Colorado *et al.* to BLM (July 24, 2023), attached as Exhibit JJ; *see also* Letter from Colorado Senator Michael F. Bennet and Colorado Congressmember Joe Neguse to BLM (Sept. 7, 2023), attached as Exhibit KK; *see also* Letter from Northwest Colorado Council of Governments Water Quality/Quantity Committee to BLM (Nov. 29, 2023), attached as Exhibit LL; *see also* Letter from the General Assembly of the State of Colorado to BLM (Dec. 22, 2023), attached as Exhibit MM; *see also* Letter from Grand County, Colorado Board of Commissioners to BLM (Jan. 2, 2024), attached as Exhibit NN.

149.    For many months, Eagle County and the public received no information or update from BLM regarding the proposed Wildcat Facility Expansion.

150.    Around May 2024, BLM posted on its website that the proposed Wildcat Facility Expansion was "cancelled." *Wildcat Loadout Facility ROW Amendment (Cancelled)*, DOI-BLM-UT-G020-2023-0013-EA, BLM National NEPA Register, attached as Exhibit OO.  The notification states that "BLM is terminating the [environmental assessment] process for this project prior to completion as we are waiting on additional information from the proponent." *Id*.

151.    It is unknown what requested information Coal Energy failed to provide to BLM.

**E.    In the summer of 2025, BLM abruptly changed course and rushed approval of the Wildcat Facility Expansion without public notice and comment and without considering the environmental impacts associated with increased oil trains on the Union Pacific Line.**

152.    According to BLM, on May 1, 2025, Coal Energy "requested that BLM process its Wildcat Loadout Facility ROW amendment under [A]lternative [A]rrangements for NEPA compliance," and that "[o]n June 19, 2025, the request was approved."  Exhibit C at 6.

153.    On June 18, 2025, BLM posted notification under a new agency docket number on its public ePlanning website that BLM was considering a modification to the Wildcat Facility to "increase [Coal Energy's] crude oil transloading (transfer from truck to train) capacity." *Wildcat Loadout Facility ROW Amendment*, DOI-BLM-UT-G020-2025-0015-EA, BLM National NEPA Register, attached as Exhibit PP.

154.    That notification was the first time BLM provided the public with information of the Wildcat Facility Expansion since May 2024, when BLM cancelled the draft environmental assessment it had been preparing for public review and comment.

155.    BLM stated the "environmental analysis is being prepared under [A]lternative [A]rrangements for compliance with the National Environmental Policy Act amid the National Energy Emergency as declared by Executive Order 14156 Declaring a National Energy Emergency on January 20, 2025." *Id.*

156.    Alarmed by BLM's decision to process the Wildcat Facility Expansion under Interior's Alternative Arrangements, Eagle County and numerous parties submitted letters to BLM explaining that there is no energy crisis, that NEPA requires an environmental impact

statement for the Wildcat Facility Expansion, and that FLPMA and NEPA required a public and review and comment process similar to the public review that BLM had proposed for the 2023 Application. *See* Letter from Eagle County to BLM (June 30, 2025), attached as Exhibit QQ; *see also* Comments from Center for Biological Diversity and Southern Utah Wilderness Alliance to BLM (June 27, 2025), attached as Exhibit RR; *see also* Letter from Colorado Attorney General Phil Weiser to BLM (June 27, 2025), attached as Exhibit SS; *see also* Letter from Town of Palisade, Colorado to BLM (Undated), attached as Exhibit TT.

157.    In its June 30, 2025 letter, Eagle County reiterated the environmental harms downline communities would endure from the Wildcat Facility Expansion and the significant increase in oil trains on the Union Pacific Line, including increased risks of downline congestion, oil train accidents, and the associated potential for wildfire and contamination of the Colorado River system. Exhibit QQ at 2–4.

158.    Eagle County contested the decision to utilize the Alternative Arrangements as illegal on several grounds, stating that "[t]he Administration's policy choice to increase domestic fossil fuel production through expedited permitting procedures is not precipitated by a sudden, urgent, or unexpected event requiring immediate action and therefore does not qualify as an emergency under the BLM's own interpretation or court precedent." *Id.* at 3. As a result, "BLM's own regulations do not permit it to authorize 'alternative arrangements' under circumstances such as these." *Id.*

159.    Eagle County also noted that the Executive Order relied on by BLM to utilize the Alternative Arrangements authorized the President to exercise "any special or extraordinary power" that is authorized by an Act of Congress, but that NEPA did not grant any "special or extraordinary power" to waive NEPA during a national emergency. *Id.* at 2–3.

160.    The Center for Biological Diversity and the Southern Utah Wilderness Alliance ("Environmental Groups") echoed Eagle County's concerns regarding approval of the Wildcat Facility Expansion in their comments to BLM. Exhibit NN. The Environmental Groups highlighted the significant reasonably foreseeable environmental impact that the Wildcat Facility

Expansion would cause by following "'the only practical route for all rail traffic heading eastward' from Utah," including "worsen[ing] the risk of derailments, vehicle crossing collisions, wildfire risks, wildlife collisions, [and] oil spills, including spills along the Colorado River, which roughly parallels the Union Pacific line for over 100 miles." *Id.* at 13; *see also id.* at 14–26 (detailing environmental impacts).

161.   Quoting analysis from the Pipeline and Hazardous Materials Safety Administration (PHMSA), the Environmental Groups noted that "[t]here are many unique features to the operation of [High-Hazard Flammable] unit trains to differentiate their risk," including a higher likelihood of "derailment rate, derailment severity, and the corresponding risk in a route-specific risk analysis." *Id.* at 14.  Backed by extensive discussion of the national energy grid, the Environmental Groups stated that "the premise that a national energy emergency exists, and that completion of the [NEPA] analysis for Wildcat must be completed in 14 days to address such an emergency, is baseless." *Id.* at 1.

162.   The Environmental Groups also commented that the Executive Order "does not give the President any 'special or extraordinary power' to waive [NEPA's] requirements during national emergencies," *Id* at 5.  They also commented that BLM's regulations do not support use of Alternative Arrangements here because "[t]he administration's policy goal of increasing domestic energy production does not qualify as an emergency for NEPA purposes." *Id.* at 6.  Instead, "[t]he concerns described by the Executive Order all involve long-standing policy and market issues that have existed, and which the federal government has engaged with, for years." *Id.* at 6–7.

163.   Further, the Environmental Groups noted that BLM could not explain why approving the Wildcat Facility Expansion necessitated the Alternative Arrangements, when "[t]his project has been on hold for two years," and "approval will not immediately increase oil and gas production from federal lands." *Id.* at 7–8.  The Environmental Groups also noted BLM's approval without public review and comment violated FLPMA and NEPA. *Id.* at 9–11.

36

164.    On July 3, 2025, BLM issued a Final Environmental Assessment, Finding of No Significant Impact, and Decision Record approving the Wildcat Facility Expansion which was identical to Coal Energy's project proposed in its 2023 Application, without any opportunity for public comment.  *See* Exhibit A at 1; Exhibit B; Exhibit C at 5, 26, 44–45.

165.    The Decision Record "[a]uthorize[d] the amendment of the Right-of-Way (ROW) to reconfigure and expand transloading facilities" at the Wildcat Facility as described in the Final Environmental Assessment.  Exhibit A at 1.

166.    BLM's statement of purpose and need from the "Proposed Action" was severely narrow given that the objective of the Wildcat Facility Expansion was to increase the transport of oil from the Uinta Basin, which could be accomplished numerous ways.  BLM stated the purpose and need was to "change the facility layout and add facilities."  Exhibit C at 11.

167.    Although the Final Environmental Assessment assumes a throughput of 100,000 barrels per day under the Wildcat Facility Expansion, *id.* at 34, unlike past BLM authorizations for the Wildcat Facility, the Decision Record does not specify a maximum number of crude oil barrels that are authorized to be transported each day from the Facility.  *Cf.* Exhibit Y at 3 *with* Exhibit SS at 1.

168.    In explaining the approval, the Decision Record concludes without analysis that "the Proposed Action alternative is in the public interest" and "it meets the BLM's purpose and need as described in the [Final Environmental Analysis] Section 1.2."  *Id.* at 3.

169.    The Decision Record also concludes "[t]his decision will aid in addressing the national energy emergency declared in Executive Order 14156" because it "will facilitate the transportation of energy minerals by expanding crude oil transloading facilities at the Wildcat Loadout Facility."  Exhibit A at 3.

170.    The Decision Record and Environmental Assessment, whose stated purpose was to consider Coal Energy's proposal to "add facilities," allows an approximately 400% increase in transloaded oil at the Facility from the existing 20,000 barrels per day to 100,000 barrels per day. Thus, BLM's authorization of the Wildcat Facility Expansion significantly increases the number

of oil-laden train cars leaving Martin Yard per day—from approximately 35 railcars to 200 railcars—traveling on the Union Pacific Line.  *See* Exhibit C at 19, 23, 26, 41.[10]

171.    BLM's authorization of the Wildcat Facility Expansion and the roughly 400% increase[11] in train cars loaded each day would result in an increase from 0.33 oil trains carrying 20,000 barrels of oil a day (i.e., one every three days) to 1.7 oil trains carrying 100,000 barrels of oil per day traveling from the Facility on the Union Pacific Line through public lands and Eagle County.  *See id.*

172.    The Final Environmental Assessment identified the Uinta Basin as the source of oil currently transloaded at the Wildcat Facility and identified "refineries in Texas and Louisiana on the Gulf Coast" as the current and expected destination for the additional oil transloaded under the Wildcat Facility Expansion.  *Id.* at 5, 34, 75.

173.    The Final Environmental Assessment also identified a "growth in production . . . mostly related to more Uinta Basin crude oil heading to the Gulf Coast via trains that are loaded in Carbon County," and noted that "to respond to production and the lack of [in-state] refining capacity, three transloading sites began transferring crude oil from trucks to railway cars," including the Wildcat Facility.  *Id.* at 75.

174.    Based on the expected 400% increase in oil tanker railcars loaded at and leaving the Wildcat Facility on the Utah Railway Line to Martin Yard, the Final Environmental

---

[10] The Final Environmental Assessment provides widely divergent figures informing the expected change in the number of loaded railcars.  In one instance it states that "approximately thirty-five (35) loaded railway cars are assembled into a unit containing approximately 20,000 barrels per day (bbl) of crude oil," and that the Wildcat Facility currently "forms one train approximately every three (3) days."  Exhibit C at 19.  Elsewhere, however, it states that the number of railcars will be increased from 48 rail cars per day, *id.* at 67, while the historical train data shows far less than 35 rail cars per day, *id.* at 41 (indicating 25 rail cars a day in 2022, the last year for which data is provided).  Likewise, the projected number of rail cars is also inconsistently stated as 160 rail cars, *id.* at 67, "1.7 trains every day," which at 104 cars per train equates to 177 rail cars, *id.* at 26, and "200" rail cars per day, *id.* at 41.  Under any scenario, there will be a significant increase in rail cars.

[11] The inconsistent figures provided for existing and expected railcars, *see supra* n. 12, results in a wide variance of the possible expected increase in rail cars, from between 333% to 800%.

Assessment reviewed the effects of the increased rail traffic on only that six mile rail line. Specifically, the Final Environmental Assessment disclosed and evaluated "[w]hat impacts would occur because of the increase in rail traffic between [the Facility] and Martin Yard." *Id.* at 40.

175. BLM's analysis of increased rail traffic between the Facility and Martin Yard considered the potential for train accidents, accidental spills, accident-caused fires, animal strikes, and changes in noise and light effects. *Id.* at 42–43. The Final Environmental Assessment concluded that "the accident and spill rates between the [Facility] and the Martin Yard will be negligible" because of the "the slow speed due to the elevation change and short mileage, the lack of sensitive habitats other than one ephemeral wash and given there are no other trains on the track." *Id.* at 42–43.

176. BLM did not analyze the effects of rail traffic after trains leave Martin Yard and join the Union Pacific Line a quarter-mile away. *Id.*

177. Despite identifying the Gulf Coast as the destination of existing transloaded oil trains, BLM feigns ignorance about the amount of oil transloaded at the Wildcat Facility or where the Facility's oil trains would travel. *Id.* at 33–34. Specifically, BLM states that "market forces . . . unrelated to the Proposed Action" would determine "the ultimate amount of crude oil that leaves the Martin Yard." *Id.*

178. Further, BLM characterized oil train traffic along the Union Pacific Line as a separate alternative, rather than an impact of the Wildcat Facility Expansion under the Preferred Alternative, stating incorrectly that "[d]uring public scoping in 2023 . . . the public requested that the oil not be transported along the railway through Eagle County, Colorado." *Id.* at 31. BLM then dismissed this alternative as "out of the scope of the [environmental assessment]" because "a decision to allow the expansion . . . on the part of the BLM would not approve any particular transportation route." *Id.* at 32.

179. BLM also asserted that "train transportation and hazardous materials transportation are regulated by other agencies . . . so it is outside the jurisdiction of the BLM." *Id.* at 32. BLM did not address or mention that the transportation of oil from the Project along the Union Pacific

Line would travel through BLM-managed lands within BLM's jurisdiction, despite that BLM is legally obligated to consider impacts to those lands it manages.

180. The Final Environmental Assessment's chapter on consultation indicated that BLM did not consult with the STB, Federal Railroad Administration (FRA), or PHMSA, *see id.* at 44–45, even though all three of these agencies have some jurisdiction over aspects of the rail traffic under the Wildcat Facility Expansion.

181. BLM did not consult the STB in preparing the Final Environmental Assessment, even though the STB has jurisdiction over the Union Pacific Line and the Utah Railway Line and previously evaluated the effects of increased oil trains on the Union Pacific Line as a result of the proposed Uinta Basin Railway. *See* Exhibit M; Exhibit O. BLM relied selectively on some of the STB's analysis of the Uinta Basin Railway in the Final Environmental Assessment, Exhibit C at 38, 42–43, 48, but failed to consider the STB's existing analysis of downline impacts of increasing oil train traffic on the Union Pacific Line, which should have indicated to BLM that such analysis was not only possible, but that a sister agency had already conducted at least some of the work.

182. In assessing the increase in rail traffic under the Uinta Basin Railway, the STB noted that the Union Pacific Line segment "currently has a low volume of rail traffic relative to the predicted traffic." Exhibit O at 3.2-6. The STB determined that the Uinta Basin Railway would increase rail traffic on the Union Pacific Line by between 0.4 and 9.5 trains a day, *id.* at 3.1-3 and, based on national data for accident rates, the Union Pacific Line segment between Utah and Denver, Colorado "would experience more than two times the risk of an accident than under baseline (existing) conditions" and an increase of "about 40 percent from the baseline risk" in the low rail traffic scenario, *id.* at 3.2-6

183. BLM did not consider the impact of a similar significant increase of rail traffic on the Union Pacific Line if the Wildcat Facility Expansion were approved.

40

184.    Even though FRA oversees rail safety on the Union Pacific Line and the Utah Railway Line, *see* 49 U.S.C. §§ 103, 20103(a); 49 C.F.R. Part 209, App. A, BLM failed to consult with FRA regarding the Project.

185.    BLM cites FRA accident statistics in its Final Environmental Assessment's discussion of "accident and spill rates," but BLM's analysis was limited to the Utah Railway Line between the Facility and Martin Yard.  *See* Exhibit C at 42.  BLM failed to engage at all with FRA's accident statistics or accident profiles for the increase of rail traffic on the Union Pacific Line, and its failure to consult with FRA made it impossible to accurately assess the safety impacts of additional oil trains caused by the Wildcat Facility Expansion.

186.    Even though PHMSA has jurisdiction over the safe transportation of hazardous materials, it was not consulted by BLM for the Wildcat Facility Expansion.

187.    PHMSA has previously issued analysis of shipment of crude oil by rail indicating that the safety record of crude oil shipments by rail between 2007 and 2016 was highly variable, with rail in some years involving almost 900% more crude oil spills than either pipeline or truck shipments.  PHMSA, *Report to Congress – Shipping Crude Oil by Truck, Rail and Pipeline* (March 19, 2019), at 7, Fig. 3, attached as Exhibit UU.

188.    PHMSA notes that the variability of rail's safety record for crude oil spills was driven by "high-impact incidents," indicating that when things go wrong with shipments of crude oil by rail, they go dramatically wrong.  *Id.* at 7.

189.    BLM did not consult with PHMSA or refer to PHMSA's expert analysis of safe shipment of crude oil in developing the Final Environmental Assessment.

190.    Despite the significant increase in rail traffic traveling through public lands, including BLM-managed lands, under the Wildcat Facility Expansion, BLM concluded that "the Proposed Action alternative is in the public interest."  Exhibit A at 3.

191.    The Final Environmental Assessment also states that Coal Energy does not actually require federal public lands for its project, where "Wildcat Loadout has an agreement with Utah Candle Company, LLC to expand the Wildcat Loadout Facility onto" Utah Candle

41

Company's leased "lands adjacent to the Wildcat Loadout Facility" "should BLM reject [Coal Energy's] ROW amendment request."  Exhibit C at 6; *see also id.* at 15, 34-35, 37, 41 (discussing use of Utah Candle Company's land under No Action alternative).

192.    BLM did not discuss or explain in the Final Environmental Assessment how the apparent availability of private adjacent land for the Wildcat Facility Expansion affected the consideration of the public interest in using public lands to achieve what Coal Energy suggests allegedly could equally be achieved on private lands.

193.    As authority for the approval in the Decision Record, BLM cites Title V of FLPMA and its implementing regulations.  Exhibit A at 1.  The agency does not specify which part of Title V gives it authority for this Decision.  *See id.*

### F.    After BLM authorizes the Wildcat Facility Expansion, Coal Energy obtains state approval to transload twice the amount of oil assumed in BLM's Final Environmental Assessment.

194.    In addition to requiring BLM's authorization for a right-of-way on BLM land, air emissions from the Wildcat Facility are regulated by the Utah Department of Environmental Quality (UDEQ) pursuant to the Clean Air Act and Title 19, Chapter 2 of the Utah Code.

195.    In 2024, Coal Energy requested approval from UDEQ to increase throughput for the Wildcat Facility to 100,000 barrels per day, which UDEQ granted.  *See* State of Utah, Department of Environmental Quality, Division of Air Quality, Engineer Review, Modification to Approval Order DAQE-AN150710005-24 to Expand Transloading Operations at 3 (Oct. 21, 2025) (DAQE Engineering Review), attached as Exhibit VV.

196.    BLM's Final Environmental Assessment relied on UDEQ's approval for 100,000 barrels per day as a basis for BLM's authorization of the Wildcat Facility Expansion, stating that "[a]pproval of the ROW amendment would enable [Coal Energy] to achieve its currently authorized (under a State permit) throughput of crude oil."  Exhibit C at 20; *see also id.* at 76.

197.    However, in August 2025, one month after BLM issued the Decision Record, Coal Energy submitted a request to UDEQ to increase its permitted throughput at the Wildcat Facility

to 200,000 barrels of oil per day, doubling the amount of total throughput that Coal Energy represented to BLM would be transloaded at the Facility under the amended right-of-way authorization. *See* Exhibit VV at 51–64 (containing Coal Energy Application). UDEQ approved Coal Energy's request on December 4, 2025. State of Utah Department of Environmental Quality, Division of Air Quality, Approval Order DAQE-AN150710006-25, at 4 (Dec. 4, 2025) (DAQE 2025 Approval), attached as Exhibit WW.

198. Because the Decision Record, unlike past Decision Records, did not include a maximum throughput amount for the Wildcat Facility, the new right-of-way granted under the Decision Record effectively authorizes twice as much oil that may be transloaded at the Wildcat Facility, even though the Final Environmental Assessment considered only a 400% increase in transloaded oil at the Facility and not an 800% increase.

199. Eagle County now files this Complaint challenging Interior's Alternative Arrangements and BLM's Decision Record for the Wildcat Facility Expansion. Interior's and BLM's decisions are final agency actions subject to judicial review under the APA, 5 U.S.C. § 706, that harm Eagle County by excluding the County from participating in BLM's decision-making process and by authorizing the Wildcat Facility Expansion without adequately addressing the significant environmental and other harms to public lands and Eagle County.

### G. Eagle County filed a FOIA request seeking records concerning BLM's actions pertaining to the Wildcat Facility Expansion.

200. Considering the dearth of publicly available information concerning BLM's Wildcat Loadout Facility actions, Eagle County submitted a FOIA request letter to the BLM on September 24, 2025 (FOIA Request), seeking all records relating to the Wildcat Facility Expansion, including records related to project numbers DOI-BLM-UT-G020-2025-0015-EA and DOI-BLM-UT-G020-2023-0013-EA, and Coal Energy's request to process its right of way application pursuant to BLM's emergency permitting procedures. Kaplan Kirsch, Eagle County FOIA Request Letter to BLM at 1 (Sept. 24, 2025), attached as Exhibit XX.

43

201.    Eagle County requested a waiver of fees associated with the FOIA Request. *Id.* at 2–3; *see also* 43 C.F.R. § 2.45.

202.    On September 30, 2025, Eagle County received emails and a letter from BLM acknowledging receipt of the FOIA Request, and identified the date of receipt as September 25, 2025.  BLM, Emails and Acknowledgment Letter (Sept. 30, 2025), attached as Exhibit YY.

203.    BLM's September 30 letter assigned the FOIA Request to the "complex" processing track, which would generally take "21-60 workdays to process." *Id.* at 4.  The letter stated that BLM expected to make a determination on the FOIA request by October 24, 2025. *Id.* The letter granted Eagle County's fee waiver request. *Id.*  The letter did not seek a ten-day extension from the statutory deadline for "unusual circumstances."

204.    On December 15, 2025, counsel for Eagle County sent BLM an email informing the agency that a determination on its FOIA Request was long overdue.  R. Glenn Email to K. McAfee (Dec. 15, 2025), attached as Exhibit ZZ.  After this prompting, on December 19, 2025, BLM sent Eagle County an email attaching a letter stating that "BLM has determined it will comply with" the County's FOIA Request.  December 2025 K. McAfee Email and Letter at 2 , attached as Exhibit AAA. The letter explained that BLM "may invoke exemptions 3, 4, and/or 5," and stated that the agency was gathering materials and that once gathered, the agency would review the records to identify the quantity and nature of the records. *Id.* at 2, 3.  The agency estimated a "target completion date" for the request as "May 29, 2025 [*sic*]." *Id.* at 3.

205.    Three months later, on March 19, 2026, BLM sent an "Update Letter" to counsel for Eagle County stating that the FOIA Request was reassigned from the "complex" track to the "voluminous" track, which is "for requests that would generally take more than sixty (60) workdays to process."  March 2026 K. McAfee Letter at 3, attached as Exhibit BBB.  The letter stated that the agency had received all potential responsive records and acknowledged that the agency had not reviewed the documents. *Id.*  The agency revised the "target completion date" for the request to July 31, 2026. *Id.*

206. The March 19 letter admitted that BLM had not yet finished reviewing records responsive to Eagle County's FOIA request. *Id.*

207. Other than describing the records received by the agency as "exceed[ing] 9,000 pages," and similar to the December 19 letter, the March 19 letter did not inform Eagle County of the scope of the records that the agency will produce or the scope of the records that the agency plans to withhold under any FOIA exemptions. *See id.* at 3.

208. The December 19 and March 19 letters did not seek an extension of the statutory determination deadline for "unusual circumstances." *See* 5 U.S.C. § 552(a)(6)(B)(i).

209. The December 19 and March 19 letters were not BLM's determination on Eagle County's FOIA Request. *See Citizens for Responsibility & Ethics in Wash.*, 711 F.3d at 188.

210. As of the date of filing this complaint, and contrary to the March 19 letter, the Interior/BLM FOIA Public Access Link website identifies the status of Eagle County's FOIA Request as "Assigned for Processing" and provides an estimated delivery date of July 10, 2026.

211. BLM did not provide a determination on Eagle County's FOIA Request within the twenty workdays permitted under the circumstances, which deadline lapsed on October 23, 2025.[12] *See* 5 U.S.C. § 552(a)(6)(A)(i), (a)(6)(B)(i); 43 C.F.R. §§ 2.16(a), 2.19.

212. To date, BLM has not issued a determination on Eagle County's FOIA Request or produced any records in response to Eagle County's FOIA Request.

213. The information sought in Eagle County's FOIA Request is critical to understanding BLM's actions and decisions related to the Wildcat Loadout Facility and taking action to protect the County's interests threatened by the Project.

214. BLM's failure to respond to Eagle County's FOIA Request within the required timeframe has harmed Eagle County by preventing the County from being fully informed

---

[12] If workdays were paused during the government shutdown, such that no workdays are counted between October 1, 2025, and November 12, 2025, and recognizing the federal holiday on November 27, 2025, twenty workdays lapsed on December 5, 2025.

regarding the Project and from being able to inform the County's residents and the public about the Project.

## CLAIMS FOR RELIEF

**Count I:  Interior's Alternative Arrangements are a substantive rule that was improperly issued without notice and comment in violation the APA and FLPMA.**

215.    Eagle County realleges and incorporates by reference the allegations set forth in the previous paragraphs.

216.    The APA requires a court to hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A), or taken without observance of procedure required by law, *id*. § 706(2)(D).

217.    Interior is an "agency" as defined in 5 U.S.C. § 551(1) and is subject to the APA.

218.    The APA requires Interior to follow specific procedures in rulemaking, including but not limited to the requirement that Interior publish a notice of proposed rulemaking in the Federal Register, afford interested persons an opportunity to participate in the rulemaking through comments which Interior must consider, and any final rule by Interior must contain a statement of its basis and purpose and be published in the Federal Register at least thirty days before the rule goes into effect.  5 U.S.C. § 553(b)–(d).

219.    FLPMA requires Interior to use notice-and-comment rulemaking when establishing procedures for public involvement in land management decisions.

220.    FLPMA states that "the Secretary, *by regulation*, shall establish procedures . . . to give the Federal, State, and local governments and the public adequate notice and an opportunity to . . . participate in, the preparation and execution of plans and programs for, and the management of, the public lands."  43 U.S.C. § 1739(e) (emphasis added).

221.    FLPMA further directs Interior to follow APA rulemaking procedures.  *Id.* § 1740. The Alternative Arrangements constitute rulemaking procedures requiring public notice and comment.

46

222.    The Alternative Arrangements are a final agency action as they are the consummation of Interior's decisionmaking to implement the Executive Order, and they unlawfully restrict environmental analysis and exclude public comment on proposed actions under FLPMA—including rights-of-way issued by BLM.  These violations of FLPMA and the APA negatively affect the rights of Eagle County.

223.    The Alternative Arrangements also are an improper substantive rulemaking because they are a "statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements" for reviewing projects before Interior, including BLM.  *See* 5 U.S.C. § 551(4).

224.    The Alternative Arrangements go beyond internal procedures and substantially affect the right of third parties to comment, consult, and otherwise participate in the covered decisions.  *See W. Energy All. v. Salazar*, No. 10-cv-237F, 2011 U.S. Dist. LEXIS 98378, at *18-22 (D. Wyo. Aug. 12, 2011) (instruction memorandum changing implementation of NEPA required notice-and-comment rulemaking).

225.    The Alternative Arrangements are invalid because Interior improperly promulgated them without complying with the notice-and-comment rulemaking process required by the APA and FLPMA.

226.    Interior's failure to promulgate the Alternative Arrangements through notice-and-comment rulemaking was arbitrary, not in accordance with the law, and in violation of the APA and FLPMA.

### Count II:  The Alternative Arrangements are an improper invocation of Interior's emergency response procedures, do not respond to any emergency, and violate FLPMA, NEPA, and the APA.

227.    Eagle County realleges and incorporates by reference the allegations set forth in the previous paragraphs.

228.     Interior's Alternative Arrangements are a final agency action that is arbitrary and violates FLPMA, NEPA, and the APA.

229.     Interior purports to rely on the Executive Order's assertion that an "energy emergency" exists as the basis for issuing the Alternative Arrangements.

230.     FLPMA and its regulations do not provide Interior the authority to issue Alternative Arrangements under a theory that there is an "energy emergency" as alleged in the Executive Order.

231.     NEPA also does not provide Interior with any authority to waive its requirements under the circumstances described in the Executive Order.

232.     The "energy emergency" claimed to exist in the Executive Order does not fall within Interior's definition of "emergency."  Interior defines an "emergency" as "a sudden, urgent, usually unexpected occurrence or occasion requiring immediate action" or "an unforeseen combination of circumstances or the resulting state that calls for immediate action."  73 Fed. Reg. at 61,301.

233.     Interior's authority to implement its emergency response procedures and take actions with alternative NEPA procedures is strictly limited to actions necessary to control the immediate impacts of an emergency that are urgently needed to mitigate harm to life, property, or important natural, cultural, or historic resources.  43 C.F.R. § 46.150(a).

234.     Interior's utilization of emergency procedures under FLPMA to fulfill the President's directive in the Executive Order violates FLPMA because FLPMA does not authorize emergency actions under the circumstances described in the Executive Order.

235.     Interior failed to articulate a reasoned explanation as to how the Executive Order's directive constitutes an emergency within the meaning of 43 C.F.R. § 46.150(a).

236.     Further, Interior provides no factual basis for its finding that an "energy emergency" exists and the information before Interior contradicts its purported finding of an "energy emergency."

48

237. Actions that are not necessary to address the immediate impacts of the emergency, whether urgently needed to mitigate harm or subsequently taken, are subject to Interior's standard NEPA procedures. *Id*. § 46.150(d).

238. Interior's Alternative Arrangements are arbitrary, lack any rational basis, are contradicted by the facts before the agency, and violate FLPMA, NEPA, and the APA.

**Count III: BLM's decision to authorize the Wildcat Facility Expansion under the Alternative Arrangements violates FLPMA, NEPA, and the APA.**

239. Eagle County realleges and incorporates by reference the allegations set forth in the previous paragraphs.

240. BLM's approval of the Wildcat Facility Expansion under the Alternative Arrangements is arbitrary and violates Interior's emergency response regulations allowing alternative environmental review procedures "only if" BLM "determines that an emergency exists that makes it necessary to take urgently needed actions . . . ." *Id.* § 46.150.

241. BLM may use "alternative arrangements" only if BLM must "take those actions necessary to control the immediate impacts of the emergency that are urgently needed to mitigate harm to life, property, or important natural, cultural, or historic resources. *Id*. § 46.150(a).

242. In its Decision Record, BLM failed to consider whether an emergency under 43 C.F.R. § 46.150(a) necessitates using alternative NEPA procedures for the Wildcat Facility Expansion. BLM's approval of the Wildcat Facility Expansion was not necessary to control the "immediate impacts of the emergency that are urgently needed to mitigate harm to life, property, or important natural, cultural, or historic resources." *Id*.

243. BLM acted arbitrary by authorizing the Wildcat Facility Expansion under the Alternative Arrangements and only at the request of Coal Energy after BLM had previously cancelled the right-of-way application process for the Facility.

244. Because approval of the Wildcat Facility Expansion was not necessary to control the immediate impacts of an emergency as defined by Interior in its emergency response

regulations, Interior's standard NEPA requirements and processing apply to the Wildcat Facility Expansion application. *Id*. § 46.150(d).

245.    BLM's failure to process the Wildcat Facility Expansion application under the standard NEPA requirements was arbitrary and in violation Interior's emergency response procedures, FLPMA, NEPA, and the APA.

**Count IV:  BLM's rushed decision authorizing the Wildcat Facility Expansion
failed to make reasoned, supported findings demonstrating that the
Project complied with FLPMA and the APA.**

246.    Eagle County realleges and incorporates by reference the allegations set forth in the previous paragraphs.

247.    FLPMA requires BLM to manage the public lands within its jurisdiction to prevent "unnecessary or undue degradation." 43 U.S.C. § 1732(b).

248.    BLM's authority to grant, renew, issue, or otherwise amend a right-of-way under FLPMA is limited to rights-of-way that "require" the use of public lands and "are in the public interest."  43 U.S.C. § 1761(a)(7).

249.    By authorizing the Wildcat Facility Expansion without evaluating the impacts of the Project's significant increase in oil train traffic through public lands—despite an earlier determination in 2023 that those environmental effects should be evaluated as part of the Project—BLM failed to prevent the degradation of public lands and failed to determine whether the Wildcat Facility Expansion is in the public interest. *See id.* §§ 1732(b), 1761(a)(7).

250.    In addition, by identifying a potential alternative to Wildcat Facility Expansion— including an alleged option to use private adjacent lands owned by Utah Candle Company— BLM's decision to authorize the Wildcat Facility Expansion arbitrarily grants a right-of-way for a project that does not require public lands in violation of FLPMA.  43 U.S.C. § 1761(a)(7).

251.    BLM acted arbitrarily by failing to establish a maximum throughput as a condition of its approval of the new right-of-way, which was necessary to ensure compliance with FLPMA's protections of public lands and the public interest

252.    BLM failed to include terms in right-of-way that ensure compliance with FLPMA, including but not limited to terms intended to "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment."  43 U.S.C. § 1765(a).

253.    BLM failed to make a reasoned determination on the relevant FLPMA statutory requirements in approving the Wildcat Facility Expansion, including determinations that the Wildcat Facility Expansion would not cause "unnecessary or undue degradation," is in the public interest, and requires the use of public land.   BLM arbitrarily ignored evidence before the agency demonstrating that the Project does not comply with those FLPMA requirements.

254.    BLM's authorization of the Wildcat Facility Expansion is arbitrary, contrary to the facts before BLM when it authorized the Project, and violates FLPMA and the APA.

**Count V:  BLM's environmental review of the Wildcat Facility Expansion failed to take the "hard look" required under NEPA and the APA.**

255.    Eagle County realleges and incorporates by reference the allegations set forth in the previous paragraphs.

256.    BLM's decision to authorize the Wildcat Facility Expansion violates NEPA and the APA by failing to adequately assess the environmental impacts of the project.

257.    In its review of the 2023 Application for the Wildcat Facility Expansion, BLM determined that NEPA required BLM to evaluate and consider the environmental effects of the significant increase in oil train traffic that would travel on the Union Pacific Line, including through BLM-managed lands, caused by BLM's authorization of expanded transloading capacity at the Facility.

258.    BLM also determined that the Project required public review and comment.

51

259.    In rushing the environmental review of the Wildcat Facility Expansion under the Alternative Arrangements, BLM arbitrarily reversed its previous determinations in violation of NEPA and the APA.

260.    BLM's statement of purpose and need for the Wildcat Facility Expansion was arbitrarily narrow in violation of NEPA and improperly restricted BLM's alternatives analysis.

261.    BLM erroneously dismissed consideration of oil train traffic along the Union Pacific Line as a separate alternative, rather than a reasonably foreseeable effect of the Wildcat Facility Expansion under the Preferred Alternative.

262.    BLM violated NEPA's "hard look" requirement that BLM consider reasonably foreseeable indirect effects of a project "even if those effects might extend outside the geographical territory of the project or might materialize later in time." *Seven Cnty.*, 605 U.S. at 190; *see also* 42 U.S.C. 4332(2)(C).

263.    BLM acted arbitrarily in considering the impacts caused by transportation of oil by rail over the Utah Railway Line between the Wildcat Facility and Martin Yard but not on the Union Pacific Line just beyond the Martin Yard, when the information before BLM indicated the same foreseeable significant increase in traffic on both rail lines.

264.    BLM failed to take the requisite "hard look" by excluding downline effects of oil trains on the Union Pacific Line as effects of the Preferred Alternative in the Final Environmental Assessment, despite BLM determining its "decision will facilitate the transportation of energy minerals by expanding transloading facilities at the Wildcat Loadout Facility."   Exhibit Y at 3.

265.    BLM also acted arbitrarily in failing to consider the downline effects even on BLM managed lands through which additional traffic from the Project would travel along the Union Pacific Line.  BLM's decision to ignore downline effects of the Project—when evidence before the agency demonstrated that such impacts were reasonably foreseeable—was arbitrary.

266.    In addition, BLM's failure to consult with other federal agencies regarding the impact of the Wildcat Facility Expansion violates NEPA and the APA.  In violation of NEPA, BLM failed to consult with other federal, state, and local agencies regarding the environmental

effects of rail traffic who have "special expertise with respect to any environmental impact involved in [the Wildcat Facility Expansion]." 42 U.S.C. § 4336a(a)(3). BLM failed to consult with the STB, FRA, EPA, and PHMSA, which resulted in a failure to properly assess the significance of the impacts from oil train traffic caused by the Wildcat Facility Expansion. *Id.*

267. BLM acted arbitrarily by ignoring analyses conducted by the STB and PHMSA that were presented to the agency, including the STB's assessment regarding the substantially similar downline impacts of the Uinta Basin Railway and FRA's and PHMSA's consideration of safety and specific hazards caused by oil shipment by train. And BLM failed to consult EPA and other relevant agencies in reversing course and approving the Project, even though EPA was consulted on and raised concerns about a previous iteration of the Project.

268. BLM also failed to consult with other interested local agencies—including Eagle County—regarding the environmental effects of the Wildcat Facility Expansion despite receiving comments from Eagle County and other interested parties and representing that the Project would be subject to public review and comment.

269. Without adequate consultation and consideration of local, state, and federal agencies' expertise, BLM was unable to adequately assess the impacts of transporting the additional oil by train through BLM's public lands and Eagle County.

270. BLM failed to consider the actual environmental impact of its approval of the Wildcat Facility Expansion when it relied on Coal Energy's representation that the expansion would result in an increase of 100,000 transloaded barrels a day, rather than the 200,000 barrels a day that Coal Energy plans to transload.

271. BLM acted arbitrarily in not establishing a maximum throughput as a condition of its approval of the new right-of-way, as it had in the past, which renders BLM's Final Environmental Assessment flawed because it was based on the assumption that the Wildcat Facility Expansion would result only in an increase of 100,000 transloaded barrels a day at the Facility.

272.    BLM's authorization of the Wildcat Facility Expansion violates NEPA and the APA.

**Count VI:  BLM arbitrarily reversed its commitment to provide an opportunity for public participation in the agency's decisionmaking process for the Wildcat Facility Expansion in violation of FLPMA, NEPA, and APA.**

273.    Eagle County realleges and incorporates by reference the allegations set forth in the previous paragraphs.

274.    BLM committed to public participation in its decisionmaking process for the Wildcat Facility Expansion in 2023, as required by FLPMA and NEPA.

275.    FLPMA requires public involvement in BLM management of public lands. 43 U.S.C. § 1739(e) (requiring BLM to "give the Federal, State, and local governments and the public adequate notice and an opportunity to comment upon . . . the management of, the public lands.").

276.    "Public involvement" means giving affected citizens an opportunity for participation in rulemaking and decisionmaking with respect to public lands. *Id*. § 1702(d).

277.    NEPA declares it is the "continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures . . . in a manner calculated to foster and promote the general welfare." 42 U.S.C. § 4331(a).

278.    Under NEPA, BLM  "must, to the extent practicable, provide public notification and public involvement when an environmental assessment is being prepared." 43 C.F.R. § 46.305(a).  BLM "must consider the comments that are timely received, whether specifically solicited or not." *Id*. § 46.305(a)(1).

279.    The level of public involvement offered by BLM must "permit members of the public to weigh in with their views and thus inform the agency decision-making process," and the participation period must be "sufficiently long to permit members of the public to weigh in on the decision in an informed manner." *Mont. Wildlife Fed'n*, 127 F.4th at 38(citation omitted).

54

280.    When BLM notified the public on June 18, 2025, that it was considering authorizing the Wildcat Facility Expansion, Eagle County and numerous parties requested that BLM provide more information about the Project and provide opportunity for  public review and comment.

281.    On July 3, 2025, BLM approved the Wildcat Facility Expansion, which was the same project that it determined should be subject public review and comment in 2023.

282.    BLM did not provide an opportunity for public comment.  BLM did not seek public comments on any draft environmental review.

283.    BLM did not permit members of the public to weigh in with their views and thus inform the agency decision-making process in granting the Wildcat Facility Expansion.

284.    BLM's decision to reverse its determination in 2023 that public review and comment was necessary was arbitrary and in violation of the APA.

285.    BLM's failure to provide an opportunity for the public—including Eagle County and other government agencies—to review and comment BLM's environmental review and other analyses of the Wildcat Facility Expansion is unlawful and violates FLPMA, NEPA, and the APA.

### Count VII:  BLM failed to make a determination on Eagle County's FOIA Request within the statutory deadline, in violation of the Freedom of Information Act.

286.    Eagle realleges and incorporates by reference the allegations set forth in the previous paragraphs.

287.    Under FOIA, Eagle County has a statutory right to have BLM process its FOIA Request in a timely manner.

288.    Under FOIA, Eagle County has a statutory right to obtain all non-exempt records responsive to its FOIA Request.

289.    BLM's treatment of Eagle County's FOIA Request violates FOIA.

290.    BLM failed to comply with the statutory deadline for issuing a determination on Eagle County's FOIA Request.  *See* 5 U.S.C. § 552(a)(6)(A)(i).

291. BLM failed to make a determination on Eagle County's FOIA Request from which Eagle County could exercise its statutory right of appeal. *See id.*

292. BLM failed to provide a definitive deadline on which it would complete action on Eagle County's FOIA Request. *See id.* § 552(a)(6)(B)(ii).

293. BLM failed to produce all non-exempt records responsive to Eagle County's FOIA Request. *See id.* § 552(a)(3)(A).

294. Unless enjoined by this Court, BLM will continue to violate Eagle County's legal rights to timely receive a complete set of responsive records sought through Eagle County's FOIA Request.

295. It is in the public interest for the Court to issue an injunction requiring BLM's immediate compliance with FOIA.

**REQUEST FOR RELIEF**

Eagle County respectfully requests the following relief:

A. Declare Interior's Alternative Arrangements unlawful, arbitrary, and in violation of FLPMA, NEPA, and the APA;

B. Enjoin Interior from authorizing projects under the Alternative Arrangements and vacate any decision authorized under the Alternative Arrangements;

C. Declare that BLM's decision authorizing the Wildcat Facility Expansion under the Alternative Arrangements is unlawful, arbitrary, and in violation of FLPMA, NEPA, and the APA;

D. Enjoin activities under the Wildcat Facility Expansion that BLM authorized;

E. Declare unlawful BLM's failure to provide Eagle County with a determination on its FOIA Request within FOIA's deadline.

F. Declare unlawful BLM's failure to make the requested records promptly available to Eagle County.

57

G. Order BLM to provide Eagle County with all responsive records immediately, in unredacted form unless an exemption is applicable and properly asserted.

H. Order BLM to provide a *Vaughn* index of any responsive portions of records withheld under the claim of a FOIA exemption. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

I. Award Eagle County its reasonable attorney fees and litigation costs incurred from bringing this action, including under 5 U.S.C. § 552(a)(4)(E), 28 U.S.C. § 2412, and any other applicable law; and

J. Grant any further relief as the Court deems just and proper.

Respectfully submitted on March 26, 2026.

/s/ *Nathaniel H. Hunt*
Nathaniel H. Hunt (Bar ID CO0107)
Christian L. Alexander*
Rebecca Glenn (Bar ID CO00134)
Kaplan Kirsch LLP
1675 Broadway, Suite 2300
Denver, CO  80202
(303) 825-7000
nhunt@kaplankirsch.com
calexander@kaplankirsch.com
rglenn@kaplankirsch.com

*Applying for pro hac vice admission

*Counsel for Eagle County Colorado*